STATE, Respondent, v. OSLER, Appellant.

(228 N. W. 251.)

(File No. 6744. Opinion filed December 17, 1929.)

*Wills & Leach,* of Spencer, Neb., *P. J. Donohue,* of Bonesteel, and *George A. Buffington,* of Dallas, for Appellant.

*M. Q. Sharpe,* Attorney General, and *Frank W. Mitchell,* Assistant Attorney General, for the State.

CAMPBELL, J. Defendant was convicted of a felony in the court below and has appealed from the judgment and an order denying his motion for new trial.

The only substantial question presented by the record on this appeal has to do with the care and conduct of the jury after submission and before agreement.

We have recently had occasion to consider the matter of the conduct of the jury during deliberation in a criminal case, and to point out anew the necessity of preserving the integrity of the proceedings in trial by jury and public confidence therein. State v. Smith (opinion this day filed), 56 S. D. —, 228 N. W. 240. It appears in the instant case without dispute that the cause was finally submitted to the jury some time in the afternoon of February 1, 1928. One bailiff only was sworn, who accompanied the jury to the room provided for their deliberation and placed the jury therein. The jury remained there until shortly before 6 o'clock, at which time the bailiff took them out to a hotel for the evening meal. After the meal, and on the way back to the jury room, some of the jurors demanded some playing cards; so the bailiff went into a drug store and purchased two decks of cards (which he subse-

quently delivered to the jury), and, while he was so engaged, the sheriff of the county took the jury back to the jury room. The sheriff was not sworn in as a bailiff, and, as pointed out in State v. Smith, supra, had, of course, no right whatever to mingle with the jury in any way or to act as their custodian. An hour or so later, the jury not yet having agreed, the sheriff suggested to the bailiff that he (the bailiff) might have to stay all night with the jury, and that, if he had any matters to look after, he might go and attend to them, and he (the sheriff) would look after the jury. The bailiff accordingly left the jury in charge of the sheriff, and departed on some mission of his own, returning about 8:30 p. m. On his return, the bailiff observed that the clerk of courts was in the jury room. The bailiff swears that the clerk was "reading the instructions of the court and explaining them to the jury." The clerk admits that he was in the jury room reading the instructions to the jury, but denies that he was explaining them. The clerk says that he was reading the instructions to the jury at the request of the foreman. The foreman says that he made no such request. Be that as it may, the bailiff, observing this situation, appears to have entertained the view that it was somewhat irregular; witness the fact that he went immediately and told the sheriff what the clerk of courts was doing, and he says "the sheriff was surprised." Just why the sheriff should be so surprised is not entirely clear, in view of the sheriff's own previous conduct as reported by the clerk, who says that one reason which caused him to believe that it was all right for him to go into the jury room was that shortly before he entered the room he had seen the sheriff in the room with the jury talking and visiting with them.

In any event, the bailiff and the sheriff proceeded together into the jury room. The bailiff says that he expostulated with the clerk, and told him that he did not have a right to be in the jury room with the jury or to talk the case over with the jury while they were deliberating, to which the clerk, apparently displeased by such assumption of knowledge and authority on the part of a mere bailiff, responded that he thought he was an officer of the court and that he did have a right to be in the jury room with the jury and read the instructions of the court and explain them to the jury and give the jury any enlightenment he could. According to the bailiff's affidavit, the point seems to

have been debated at some length. The bailiff says that, when the clerk maintained his right to aid and enlighten the jury, he (the bailiff) retorted that he knew the bailiff's oath "by heart." This the clerk appears to have doubted, whereupon the bailiff, by way of proof, recited his duties as embodied in the oath, including his obligation not to allow anybody to mingle with the jury during their deliberation. At about this stage of the proceedings the bailiff and the clerk left the jury room and repaired to the sheriff's office, whence they communicated by telephone with the trial judge regarding the rights and wrongs of their controversy, and were informed by the trial judge over the telephone (properly enough, we think) that the clerk was venturing somewhat beyond the proper scope of his duty. So far as the record shows, the clerk thereafter permitted the jury to get along as best they could without his assistance.

Later in the evening, and still before agreement, one of the jurors, having separated from his fellows and departed from the jury room for a necessary purpose, on his way back stopped in at the sheriff's office and visited with the sheriff for some fifteen minutes.

■ Of course, all concerned deny any intention of wrongdoing, and all the jurors say that they were in no wise influenced by anything that happened. It appears beyond dispute, however, that, after submission and before agreement, the sheriff was in the company of the jurors and in the jury room with them, and talking with them on one or more occasions; that the clerk of courts was in there reading the instructions, whether with or without comment; that the sheriff, the clerk, and the bailiff were all in there together discussing the situation at length; and that one of the jurors was separated from the rest and visiting with the sheriff in the sheriff's office for a considerable period of time. The learned trial judge held on motion for new trial that he thought no prejudice resulted to the defendant.

We are of the opinion that, if any degree of public confidence in trial by jury is to be maintained, irregularities so gross and flagrant cannot be thus passed by. The evidence in this case is not presented by the record before us, but, where there is such open, utter, and inexcusable disregard of the law with reference to the care and conduct of the jury, we think it must be held reversi-

ble error, and neither the trial court nor this court should indulge in speculation as to whether or not it was probably prejudicial. When the trial judge learned of the situation, he should have immediately declared a mistrial, discharged the jury, and caused the case to be retried, and should have taken suitable steps to impress upon the offenders the extreme impropriety of their conduct. The verdict under the circumstances of this case cannot stand. It seems to us very clear that in this case it cannot be said that the state, as ruled in State v. Church, 7 S. D. 289, 64 N. W. 152, has sufficiently and reliably shown that an improper influence has not been exercised to the prejudice of the defendant. The judgment and order appealed from are reversed.

SHERWOOD, P. J., and POLLEY, BURCH, and BROWN, JJ., concur.